May it please the Court. My name's still Eitan Kasalianich. I'm representing Steve Edgecomb in this appeal. Edgecomb has been unable to work since June of 2012 when he was 52 years old. He's currently 58. Can I ask just, this will help me not have too many barriers in the way of your argument. So he had, somehow the claims got split between Title II and, I don't know why that happened, but it did? That's correct? More complicated than that. Under the current rules, ever since 2013, you couldn't even file a new application, well now you can't file a new application for benefits until after the Appeals Council has ruled in your case. At the time when he, his case was denied by the ALJ, you didn't have to wait until the Appeals Council denied it. So this is the claim that he filed shortly after the ALJ turned him down. That's one thing. Then you also, I'm sorry, I've lost your exact question. Well, I didn't, I didn't really put out that much of a question. I'm just trying to get straight. So the Title II claim went forward. Oh yes, okay, back to that. And our court has already affirmed the ALJ's denial of? Once. The first application ended up going all the way up to the Ninth Circuit and it was affirmed. But there was new evidence that came out right around when he filed his new application that was never considered by the previous ALJ. So that's. The 2015 letter? No, no, no, no. The two visits to two orthopedic neurosurgeons, he saw them after the ALJ had. Okay, but they just confirm what we already knew, right? About his, it's his back issues if I remember. Well, they actually, it's his neck. They confirmed that he, they both said that he needed surgery. So at the time of the ALJ's, the previous case's ALJ decision, the ALJ didn't know that two neurosurgeons thought he needed surgery. But it ended up, the Appeals Council knew that, but the Appeals Council declined review. And when the Appeals Council declines review, it's not a decision, it just ends where the ALJ decided it. Now, I want to jump back to what you were saying about why is this Title 16, not Title 2? His Title 2 eligibility had expired. However, he worked in, for a couple of years. He went back first part-time, then a little bit of full-time work, and then he reached a point he couldn't do it anymore. So he had worked and the ALJ in this case didn't look at his current earnings record to realize, hey, what do you know? He's eligible for Title 2. In addition, when he applied for benefits, an SSI application is an application for everything. SSI, Title 2, anything, Medicare, anything you happen to be eligible for. You can't apply for SSI and say I'm not going to apply for Title 2. Illegal. You have to apply. Because it's a poverty program. It's a poverty program of last resort. And so if you can get Title 2 benefits, you got to apply for it and go for it. Anyway, here, when he applied for benefits, they didn't know that he had this recent work history. They didn't know he was eligible for Title 2. They didn't take a formal, separate Title 2 application, just the one SSI application. By the time the hearing had rolled around, his current earnings record had been processed, it was in the record, and it showed that he had additional quarters of coverage and he was eligible. And so I asked his ALJ, would you please consider this as an application for Title 2 benefits? She ignored it. Well, no. I mean, this is, I always hate to, the fear of getting the cases confused, but isn't this the one where there's actually a regulation that prevented the ALJ from considering the Title 2 application, I thought? No. There's no, there was SSR, there's nothing that was... 11-1P. That's what I've got in my notes. Okay. No, it did not prevent her from considering it at all, because once the appeals counsel, okay, under 13-1P, 2P... 11-1P is what I've written. 11-1P. Okay. Right. After, under that ruling, after there's an ALJ decision, then you, this is the way it is now, you cannot apply for anything other than Title 2 benefits. That was the ruling until the appeals council rules. But that wasn't in effect when he applied. They took his, well, actually, he was able to, if it's Title, if you have a Title 2 denial, you can do a Title 16 application. But they won't process your Title 2 application until the appeals council has denied it. But once they do deny it, they will escalate it, they'll escalate the Title 2 and they'll consider it, because a Title 16 application is a Title 2 application. Basically, Social Security didn't really think through their rulings on this, because it's got this illogic to it. You require, an SSI application is an application for Title 2, but we won't process it. That's okay. But once they should process it, they still refuse to process it. I blame myself for maybe getting this off on the wrong foot. What a return to the merits. Nobody understands this. Don't worry. People who do this for a living don't understand these. And Social Security doesn't, because if they did understand it, they'd issue more clear guidelines so the judges wouldn't get this wrong. Let's turn to the merits. Can I just ask my question? Please, now. Because I just want to focus you in. I appreciate that. In contrast to the last case, this strikes me as one in which the ALJ had plenty to rely on in finding your client not credible in terms of the limitations that he claimed he was experiencing. And I'm thinking in particular of those two. Were they physical therapists who gave him this battery of tests? I have to read those physical therapist reports carefully. Because under the Ryan v. Commissioner, that decision, and now I think there's other decisions that have followed this reasoning as well, it's not proper for an ALJ to reject a physician's opinion, based on disbelieving the claimant's subjective complaints, if the physician himself didn't disbelieve the complaints. When it happened here, they did say that he was, appeared not to be exerting full effort. He's in pain. They didn't say at the end... No, they had some tests that were able to control for that, and they said in light of whatever he did on these other tests, we don't think he was, we think he was actually quite capable of doing more, and he intentionally wasn't. And I can't remember if they, was this, are they the people who observed him walking to the car or something? It was a totally, you know... They saw a different gate. He had a different gate walking to the car than he had when they were testing his gate, but they didn't describe in what way it was different. The other thing they didn't do, which they could have done, which they would have done, if they disbelieved, if they thought that he was faking his gate, faking it, didn't have any problems, and faking all of his efforts, they wouldn't have believed him. They wouldn't have limited him to sedentary to light activity. They wouldn't have said he has to change positions frequently. They wouldn't, see, physical therapists are provided, they have to be provided with the MRI reports that show, hey, what's wrong with this person? They got to know, and a referral letter from the doctor who refers them, the patient. They saw all of that. They did five and a half hours of testing. It wasn't a half hour. That's about as long as you'll ever see from physical therapy testing. And after all was said and done, they came to their conclusions of what his limitations are. Yeah, assuming that what he was claiming was true, but then they themselves said, and we have serious reason to doubt that everything that he's saying about his limitations should be credited, right? That's how I read the report. Read it again. It's not how I read the report. And the real problem is that, once again, and I've seen these reports, if a person goes to a physical therapist and doesn't have things, you know, they're faking everything in sight, and they've got ways to detect this, the physical therapist doesn't conclude. Our conclusion is he needs to be able to change positions frequently. Their conclusion will be, we can't say anything. He's got very certain we can tell there's nothing wrong with the guy. That's not what happened here. There's no strict liability standard for exaggeration. People can do it. Maybe they do do it sometimes. Maybe they have some mental health component. I hate to keep dwelling on mental health components. Maybe they're afraid. Maybe they're worried about sleeping in a car too many nights, and maybe they make mistakes and they exaggerate. But that doesn't mean that they're always lying. And we need to discount everything in the record that relates to subjective, you know, complaints or objective things that could be faked. Right? Right. Well, the issue here, too, it's consistent. Everyone who examined him, the neurosurgeons and the physical therapists and Nurse Armstrong, they all found that he had significant range of motion limitations. And the ALJ didn't entirely address these range of motion limitations, but that's objective testing that showed it was all consistent. And when you have two neurosurgeons that say, you need another next surgery. Now, remember, this guy had, Edgecove had a cervical spine surgery. And it worked for a while, but it failed. And he had a second time where he, like, had this horrible experience where they basically sort of fell off the table when they were trying to work on him. And it was just a nightmare experience that he couldn't use his arm for about a year. And that recovered sort of. But you've got, you know, the neurosurgeons aren't making up that they think he needs cervical spine surgery. And if that doesn't support that, the limitations that he describes of needing to change positions and of what the physical therapists describe, nothing does. I mean, that's very strong objective evidence. Now, it's important, and I meant... See, that's where I disagree with you. It's objective evidence that there could be a basis for his claiming the limitations that he has, and that's why he goes and gets the tests. And, I mean, I will review the report again, but I just, my recollection of it was they said, we ran him through these tests, and there's reason to doubt that he's actually as disabled as he's claiming. And that's what the ALJ bases the adverse credibility determination on. And then, on the basis of that, discounts the medical evidence. And I don't know, again, in contrast to the last case, it seems to me there's much more here that the ALJ had to rest that conclusion on. Can I comment on that, just as a follow-up? This is going to be a two-part question. I tend to agree with my colleague, and I wonder if it's just not a case where, arguably, there might be remand issues, because the ALJ did not consider, for example, is there any indication that the ALJ actually considered the opinions of doctors Manista and Halperin, or Halpin? My notes, the ALJ summarized some of the orthopedic surgeon's findings, but never said how much, if any, weight she was giving those opinions. And her conclusions seem to directly contradict some of the findings, stenosis, nerve root pressure, et cetera. ALJs can only reject an examining physician's opinion, however, for specific and legitimate reasons that are supported by substantial evidence in the record. Yes, in short. You know, I still think that the level of pain that he's been experiencing for so long, I mean, he's been on morphine for, I don't want to say 10 years, but it's been a very, he's been on heavy medications for a very long time. He's lost everything he's ever had. He's living in his truck. And he's struggling to survive. And he goes to these therapists, and some things that he does hurts him. It hurts him to do things. And he doesn't do them. He shies away from doing them. And they notice that. I just don't see that their conclusions actually show, once again, if they shouldn't be concluding that he has to frequently change positions, if it's only based on he says he has to frequently change, I mean, they just don't do that. Five and a half hours of testing, they don't just parrot back what he said about his problems. They did lots of testing and determined the guy needs to frequently change positions. And that's consistent with everything, you know, about his history with having had a cervical spline surgery and needing it again. And I guess I should reserve my, thank you. One second. Good morning. May it please the court. I am Thomas Ellsbury here on behalf of the Acting Commissioner for Social Security. Perhaps I should start out with the Title II versus the Title XVI issue, which I would disagree. There are people, particularly in our agency, that do understand this. And to start, I want to read the quote from 111P on why we have this rule. It's in a summary at the beginning, and the first paragraph concludes, this change will allow us to more efficiently use our limited resources to handle the increase in the number of initial disability claims that we have seen in light of the economic downturn. So this is for an administrative efficiency purpose. But I'll also point out that it's not a rule where you can't file a subsequent claim on the same Title II with the same issues, because you can if there's new evidence. That's allowed. So it's not a blanket denial where you have to choose to go forward with your prior case or not. Here, they chose not to. The Title XVI complaint was filed, and the agency did treat it as a joint application of more than one. And in the first initial determination letter that EDGCOMB received, it talks about the Title XVI, and then it says you have no other benefits that you're eligible for. And the accompanying documentation specifically notes prior to Title II, still before the Appeals Council. In the redetermination letter, same thing. This is limited to SSI, Title XVI, also supported by that same comment in the accompanying documentation. So he was on notice that this was not a Title II claim, and then it went to hearing as a Title XVI claim, and nothing was said about there being a Title II at the hearing. About ten days after the hearing, the letter was submitted. It was quite vague. We want you to consider Title II, but didn't say from when. Are you talking about the period that's already been addressed, or are you talking about since June 1st? What period? It was just a blanket request. But it's not, he had already waived his right to the Title II at this stage. He needed to reapply, and he's right, we would merge. Because when the Appeals Council decision came down, which was in September, let me double check the date here, February 16th, 2013, he could have filed a Title II claim. And Title II claims, unlike Title XVI, you can go back a year and be entitled to benefits. That would bring him back to the actual date we're arguing about. I mean, before June 1st or before June 6th, 2012. So to simply have filed the claim at that time would have resolved all of this, but it didn't happen. So there was no claim before the Commissioner. They had the opportunity. They didn't appeal it when we told them, you have no other claims before us, and they didn't refile when they had the opportunity. So I believe it's quite clear. As far as, let me, oh, I want... I want to address your concerns, in particular, Judge Ferguson, your concerns about the two doctors, Dr. Manista and Dr. Halpin, who, you're correct, the ALJ talks about them, but she doesn't say what weight she's giving. And I would direct you to Turner, where it says, where a physician's report does not assign any specific limitations or opinion in relation to the ability to work. The ALJ does not need to provide any reasons for rejecting the report, because the ALJ did not reject any of the report's conclusions. We have no limitations, no functional limitations in either of those two reports. There was nothing for the ALJ to reject or accept. And I would argue she accepted it, because it just reinforces the degenerative disc disease, which the ALJ found severe. But let me ask you about Dr. Daniel Cashin's letter. Under Bruce, didn't the ALJ err when it failed to consider Dr. Cashin's letter? No. Why not? Because Bruce concerns evidence that was submitted to the Appeals Council, and the Appeals Council made part of the certified transcript. Therefore, when the court reviews, the ALJ didn't have it before him, and the court can't review the Appeals Council's decision, but they do need to review, the court should review the entire record, including that evidence, because it's part of the certified administrative record. And that's what the statute allows judicial review of, the certified administrative record. Here, the Appeals Council chose not to make it part of the record, because they found it didn't relate to the relevant period, and so it's not made part of the record, and Bruce doesn't apply. It was submitted with, it is submitted with the excerpts of record, and I think it was attached to a letter by counsel, and so it's there for review, so it's quite legitimate to review it under a sentence six standard, because under sentence six, if it was evidence that was not before the ALJ, then the court can review it to determine whether it should be remanded under sentence six, which requires materiality and good cause. And I would argue neither of those are met with Dr., I'm not sure how to pronounce his name, Dr. Krashen's letter, because it talks about 2006 and 2007, and then it says things like, he's unable to engage in gainful employment. He currently walks with a cane and has a seizure dog, neither of which does the record show any prescription for. In my medical opinion, he's likely to require ongoing treatment and be unable to resume gainful employment. Okay, he didn't say why he can't, he's saying he can't work, and that's an issue reserved to the commissioner, that's clear within the statute and within our regulations. A finding of just, you're disabled, is not something... I understand that. If the matter was remanded, would Dr. Krashen be able to supplement his letter with more detailed opinions? That's unknown. What we have... I mean, as a matter of law, could he do that? Not whether it would turn out that way. Oh, yes, under Title 16, yes. And just going back to this issue concerning doctors, Manista and Halpin, I was a little unclear on what you were saying. Were you saying that because those doctors did not issue or make findings concerning functional limitations, that it's appropriate to not consider all of their medical conclusions? No, I wouldn't... And I misunderstood what you were saying. Okay, no, he was, she, the LJ accepted their conclusions about the MRIs indicating a severe impairment, but there was nothing in those opinions, in those reports anywhere that talked about a degree of limitation. Limited range of motion is the closest you get to it, but what's limited range of motion? There's no development of that. And these are the only two documents we have from these two doctors. They were submitted to the appeals council after the decision in the previous case. Did the ALJ give any indication about how much weight, if any, she gave to those opinions? No. So we don't know whether she considered them or not. We know she considered them because she talks about them. But she doesn't say how much weight she gave those opinions. Right, so I'll refer you back to Turner, which says, I see no evidence she didn't accept them. There's nothing in there that she rejected. So as Turner says, there's no error for an ALJ not to say what weight he's giving to an opinion that has no probative value regarding functional limitations. There's nothing there. And that which is there... Even if those opinions relate or may relate to bolstering the opinion of another healthcare professional? In that hypothetical, yes, that could make a difference. I don't think we have those facts here. We have a small window we're looking at, June 6, 2012, through September 13, 2013. There's very little medical evidence from there. The majority of medical evidence that is contested before this court has been adjudicated by eight different adjudicators, counting ALJs, this court, and the district courts. They've all found the same way, that these opinions do not support a finding of disability. For instance, he's not disabled up through May 31, 2012. These opinions, all predate that. And they're talking about, for example, Nurse Armstrong, talking about how limited he is, but he's been found not disabled and it's been affirmed all the way to here. So I don't know how that opinion now all of a sudden can change, especially when it predates the period we're looking at. I think she was November or December 2011, or at least six months prior. Can this court look to any possible reason that can justify the ALJ's decision, or are we limited to the ALJ's stated reasoning? The ALJ's stated reasoning is a great starting point, but under Molina and its progeny, the court must look at the entire context. This is particularly in the harmless error context. If there was error, but you look at it in the entire context of the record, is it harmless? Therefore, remand would not be appropriate. Only in that context. Correct. The first step is to look at the ALJ's actual reasoning. And may I ask, is there something, I'm at a loss as to what issue you think may not have been supported by the ALJ, because I think she did. Well, I'm just asking a general question. Yeah, definitely, without hypothetical. Sure. It's the same with Dr. Krashen. He may be able to elaborate. I noted in the briefing that he was alleged to have reviewed eight years of records from Harborview, and there's nothing in his letter that says that. He talks about 2006 and 2007, as if it was continuing all the way through, but we have this whole period before where it's been affirmed everywhere that he's not disabled up through May 31st, 2012. So I don't know how Dr. Krashen's opinion then is going to be probative, and I don't know what other evidence he's going to supply to support it, when this is the first time we see him in this record. It's 2015. So he doesn't appear to have any kind of experience treating with the claimant back to 2006. He appears to have looked at some records. I disagree that it was all eight years of Harborview records, but he appears to have looked at some records and come to a conclusion, and that's fine. But how probative is it? It doesn't give a basis for why he finds Edgecombe can't work at all. And as to the limitations and the severity, I can't remember the exact question that was asked to Edgecombe, but of course he has severe impairments, and it's the hard cases that reach this point where it's very close. But that's why the ALJ gave him a, I think it was less than light or light exertional level limitation, with other limitations accounting for the back pain and even an extra step, even though there was no evidence of a seizure and was not found to be a severe impairment, added protections in there so he wouldn't be around moving machinery or cars, anything that might be a problem if he had a seizure. No evidence of seizures in the record at all or any diagnosis of such. Is it a fair statement that the ALJ appears to have applied a strict liability view of malingering? No, I don't believe so. Could you define what you mean by strict liability of malingering? If there's some evidence of malingering, we don't believe anything that the claimant says. No, I don't believe so in this case. And in fact, I don't know that we could even go to malingering. That's sort of shorthand for misreporting. Malingering is not the right term. No, I don't believe so. I think that the evidence was so overwhelming. And, for example, the moving boxes and driving long distance and working on his knees when he says he can't do those things. Or he can only sit for five to 30 minutes, but there's... I don't mean to take up too much time, but the working on his knees that he can't do that, he worked on his knees, and then he sought medical care immediately after that. So isn't that unfair to characterize he could do these things without also adding, but yes, then he needed medical care for a significant pain? I would say it's not unfair because that's not what the LJ did. What the LJ noted, and she specifically noted, she's not saying that he can do these things. I find the fact that he ventured forth to do these things shows a mindset that he does not consider himself as limited as he's alleging. So it's not that she didn't hold him... does this thing and then requires significant medical attention. Explain that to me. He's been alleging severe back problems for years and years. I don't understand why, and the LJ didn't either, why he thought he could start moving all these boxes. I think it's a reasonable interpretation of the evidence, which is what the LJ is entitled to. Or he's titled it the deference when it's a reasonable interpretation. And while maybe you could interpret it other ways, the fact that the mindset of somebody who says, I can't stand for more than five minutes or ten minutes, now he's moving boxes and working on his knees, says he can't bend or crawl, it doesn't... I don't understand that. If the guy tries to do something and he suffers severe pain and, you know, requires medical attention, does that prove anything in terms of anything? If so, what? It doesn't prove anything, and that is the nature of a credibility assessment. It's all reviewing subjective allegations. So the ALJ is left to infer, and she stated that she was inferring his inability to engage in these activities that he then hurt himself doing. That's not denied. So he did these activities so that he would hurt himself and would therefore have a better argument that he was disabled? No, no. I can see it's not... It's not processed. I'm not getting through. I don't know how else to say it other than it was his mindset that she was assessing. He says I'm this limited. It's subjective. How do I measure this? And one of the things... There were other reasons she looked at as well. This was just one. And so I'd also argue that even if this one reason was not acceptable, the others are. And that's sufficient to support the ALJ's credibility finding. But that is just the nature of the beast. Credibility findings are the most awful things to try to review and figure out. I mean, just from our perspective. They support it. How are these handled? There's so much, I would say, deference that has to go to the ALJ's analysis. And it's when the ALJ does not fully explain her analysis, and it's not clear to the court what she was considering, that's where we get into problems. But here she was very clear, and she listed four different reasons for why his credibility... The reliability of subjective complaints were not credible. Okay. Thank you, counsel. Appreciate the argument this morning. Let me just start by pointing to the evaluations by Dr. Minista and Dr. Halpin, why that evidence is so important. There's a common misperception among ALJs that if a doctor doesn't give an opinion about functional limitations, then their findings don't matter. And that's contrary to Ninth Circuit law. It's contrary to Social Security regulations. In this case, neither of them gave an opinion about what they thought Edgecombe's limitations were. However, Dr. Halpin found that he had reduced strength in his right deltoid and in his biceps and triceps bilaterally, and he had reduced sensation in his left hand. That's a given. That's undisputed. That is an objective evidence from a treating neurosurgeon. And the ALJ didn't discuss that, and she didn't include in her residual functional capacity assessment any limitation in the use of his left hand. That would correlate with the level, because that's, when he talks about how he had trouble using his hands, well, that's well documented because of his spine. And with regard to Ms. Mertens and Ms. Lange, here we go. His poor, his variable performance, they didn't say his poor performance. His variable performance was possibly due to fear of pain, desire to have the evaluator fully appreciate one's level of perceived dysfunction, and or habitual display of reduced ability as related to one's chronic pain cycle. His pain was not like this. It was like this. You didn't read the two sentences that preceded that, which is what I had focused on. I don't like those sentences. I know you don't, but I'm just saying that they, and this is at the conclusion of the report, and it's under the heading conclusion of findings for physical effort assessment, and basically they say, look, we've done our best to give you our assessment, but we don't have any confidence that this represents his maximum abilities, because it, you know, from our... They couldn't tell from their evaluation. That's what I was saying to you when you were up here before. And I think what I would then focus back to is after that, that he goes to two neurosurgeons, and they both say, hey, you need surgery, hey, you've got weak muscles, hey, you've got reduced sensation, and those are the critical findings that never show up into the ALJ's residual functional capacity assessment. Okay. Thank you very much for the argument this morning. The case just argued will be submitted, and we are in recess for today. All rise. This court is adjourned.
judges: D.W. Nelson, Watford, Pregerson